**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| FIDELITY NATIONAL TITLE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>APM MANAGEMENT SERVICE'S LLC, RICHARD C. APPELBAUM, SARAH JANE APPELBAUM, LISA BURNETT, MMB MANAGEMENT SERVICES, LLC, MJP ENTERPRISES LLC, JAMES DYETT, LATONYA DYETT, JMD CONSULTANT LLC, LRD CONSULTANT LLC, ALAN MICHAEL GRAHAM, MGA GLOBAL ENTERPRISES LLC, and CHRISTINA LANVERMEIER,<br><br>Defendants. | Case No. 4:22-cv-01391-JAR<br><br>**JURY TRIAL DEMANDED** |

**SECOND AMENDED COMPLAINT**

COMES NOW Plaintiff Fidelity National Title Insurance Company ("Plaintiff"), by and through its undersigned counsel, pursuant to Fed. R. Civ. P. 15(a)(1)(B), and for its Second Amended Complaint against Defendants APM Management Service's LLC [sic], Richard C. Appelbaum, Sarah Jane Appelbaum, Lisa Burnett, mmb management services, llc [sic], MJP Enterprises LLC, James Dyett, LaTonya Dyett, JMD Consultant LLC, LRD Consultant LLC, Alan Michael Graham, MGA Global enterprises llc [sic], and Christina Lanvermeier (collectively, "Defendants").

**THE PARTIES**

1.      Plaintiff Fidelity National Title Insurance Company ("Plaintiff") is a Florida corporation with its principal office located at 601 Riverside Avenue, Jacksonville, Florida 32204.

2.      Defendant APM Management Service's, LLC ("APM") is a Missouri limited liability company with its principal office (and registered agent Richard C. Appelbaum) located at 11970 Tyra Ct., Maryland Heights, Missouri 63043.

3.      Defendant Richard C. Appelbaum ("Mr. Appelbaum") is a citizen of the State of Missouri who resides in the City of Maryland Heights, St. Louis County, Missouri.

4.      Defendant Sarah Jane Appelbaum ("Mrs. Appelbaum") is a citizen of the State of Missouri who resides in the City of Maryland Heights, St. Louis County, Missouri.

5.      Upon information and belief, Mr. Appelbaum is the sole member of APM.

6.      Lisa Burnett ("Ms. Burnett") is a citizen of the State of Missouri who resides in St. Charles County, Missouri.

7.      APM, Mr. Appelbaum, Mrs. Appelbaum, Ms. Burnett, and their agents, representatives, and associates shall be referred to herein as the "APM Actors."

8.      Upon information and belief, the acts and omissions alleged to have been engaged in by the APM Actors were done with the express knowledge, consent, and ratification of APM, Appelbaum, Mrs. Appelbaum, Ms. Burnett, and their officers, agents, employees, or representatives, while actively engaged in the management or operation of APM's business or affairs.

9.      Upon information and belief, all of the APM Actors, and each of them, were the agents and/or employees, co-venturers, partners or in some manner agents and/or principals for each other, and at the time of the incidents which form the basis for the Complaint, were acting within the course and scope of said agency and/or employment, with the knowledge, consent, and approval of APM.

10.   mmb management services, llc [sic] ("MMB") is a Missouri limited liability company. Sarah Jane Appelbaum is the organizer and registered agent. The principal place of business, as well as the registered agent's address, is at 11970 Tyra Ct., Maryland Heights, MO 63043. The filed Articles of Organization were to be returned to Richard Charles Appelbaum.

11.   MJP Enterprises LLC (formerly MJP legend enterprise llc [sic]) ("MJP") is a Missouri limited liability company. MJP's organizer and registered agent is Sarah Jane Marie Appelbaum at the same 11970 Tyra Ct., Maryland Heights, MO 63043 address. The filed Articles of Organization were to be returned to Richard Charles Appelbaum.

12.   Upon information and belief, Mrs. Appelbaum is the sole member of MMB and MJP.

13.   James Dyett is a citizen of the State of Maryland who resides in Baltimore County, Maryland.

14.   Latonya Dyett is a citizen of the State of the State of Maryland who resides in Baltimore County, Maryland.

15.   JMD Consultant Services LLC ("JMD") is a limited liability company organized in Maryland with its principal office listed at 4718 Eiderdown Ct, Owings Mills, MD, 21117. JMD's registered agent is James Marcus Dyett located at the same Owings Mills, MD address. JMD's sole authorized person[1] is Lisa M. Burnett located at 174 Pinedale Drive, St. Charles, MO.

16.   LRD Consultant Services LLC ("LRD") is a limited liability company organized in Maryland with its principal office listed at 4718 Eiderdown Ct, Owings Mills, MD, 21117. LRD's

---

[1] "Authorized person" means any person, whether or not a member, who is authorized by the articles of organization, by an operating agreement, or by unanimous consent of the members and any other person whose consent is required by the operating agreement, to execute or file a document required or permitted to be executed or filed on behalf of a limited liability company or foreign limited liability company under this title, or to otherwise act as an agent of the limited liability company. Md. Code Ann., Corps. & Ass'ns § 4A-101.

3

registered agent is James Marcus Dyett located at the same Owings Mills, MD address. LRD's sole authorized person is Lisa M. Burnett located at 174 Pinedale Drive, St. Charles, MO.

17.    Upon information and belief, Mr. Dyett is the sole member of JMD.

18.    Upon information and belief, Mrs. Dyett is the sole member of LRD.

19.    JMD, LRD, Mr. Dyett, Mrs. Dyett, and their agents, representatives, and associates shall be referred to herein as the "JMD Actors."

20.    Alan Michael Graham is a citizen of the State of Illinois who resides in Madison County, Illinois.

21.    MGA Global enterprises llc [sic] ("MGA") is a Missouri limited liability company organized by Alan Michael Graham.  MGA's registered agent is Richard Charles Appelbaum at 11970 Tyra Ct, Maryland Heights, MO 63043.

22.    Upon information and belief, Alan Michael Graham is the sole member of MGA.

23.    Upon information and belief, Christina Lanvermeier is a citizen of the State of Missouri who resides in Pike County, Illinois.

24.    Not named as Defendants at this time, John Does 1-99 are persons of unknown identity and citizenship.

**JURISDICTION AND VENUE**

25.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 by virtue of violations of federal law, in particular the Computer Fraud and Abuse Act ("CFAA") and the Racketeer Influenced and Corrupt Organizations Act ("RICO").

26.    This Court also has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 by virtue of complete diversity of citizenship and because the amount in controversy exceeds $75,000, exclusive of interests and costs.

4

27.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because Mr. and Mrs. Appelbaum reside in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## BACKGROUND

## DEFENDANTS' OVERALL SCHEME

28.     Defendants are engaged in an ongoing, nation-wide scheme  (the "Scheme") to defraud victims and then launder and hide the ill-gotten gains through a series of complicated money-laundering techniques. To facilitate the Scheme, Defendants:

    a.  Form sham businesses;

    b.  Obtain Employer Identification Numbers (EINs) from the Internal Revenue Service for each of the sham businesses;

    c.  Open personal and business bank accounts at financial institutions to receive and launder funds from victims of the Scheme.

29.     After the bank accounts are opened, Defendants use those bank accounts frequently, spending as little as $1-$20 on personal expenses to create the appearance of legitimacy and to reduce the likelihood that the receipt or transfer of future, substantial funds will be flagged by the financial institutions.

30.     Defendants also open accounts at numerous cryptocurrency exchanges.

31.     Defendants and/or their co-conspirators then defraud their victims through various means, including but not limited to email spoofing where they impersonate one or more individuals involved in a legitimate real estate or business transaction and divert funds through the use of fake wire instructions into bank accounts controlled by Defendants.

5

32.     Thereafter, Defendants quickly transfer the stolen funds to other bank accounts they control to both launder the funds and prevent the victims from retrieving the funds.

33.     The owners of the bank accounts retain a portion of the stolen funds as payment for creating, maintaining, and providing access to the bank accounts used in the Scheme.

34.     Ultimately, the majority of the stolen funds are transferred to various cryptocurrency exchanges which puts the funds out of the reach of U.S. courts and law enforcement.

35.     This ongoing Scheme is perpetuated by a well-managed organization that has existed for years.

**DEFENDANTS PREPARE TO DEFRAUD PLAINTIFF**

36.     As part of the ongoing Scheme and for the purpose of defrauding Plaintiff, Plaintiff specifically alleges that the APM Actors took the actions described above in Paragraphs 28 through 35, *supra*.

37.     APM was formed on August 28, 2022.

38.     Ms. Burnett acted as the return point of contact for the filing of APM's Articles of Organization with the Missouri Secretary of State, using her lmbllc@oulook.com email address.

39.     Ms. Burnett also listed this lmbllc@outlook.com email address on other corporate filings in her name.

40.      In numerous transactions leading up to December 12, 2022, Ms. Burnett sent, or attempted to send, payments ranging from $500 to $5,000 to Mr. Appelbaum.

41.     Upon information and belief, these funds were used by both Mr. and Mrs. Appelbaum in order to assist the Appelbaums in setting up sham businesses, obtaining EINs, and opening sham bank accounts

6

42.     The Appelbaums also used these funds for their personal use, which had the added effect of maintaining a façade of legitimacy in those bank accounts as set forth above in Paragraph 28. All of these acts were done in furtherance of the Scheme.

43.     Ms. Burnett also assisted the JMD Actors in organizing JMD and LRD, which were each formed on October 12, 2022.

44.     Upon information and belief, Ms. Burnett also transferred, or attempted to transfer, money to the APM Actors in sums ranging from $500 to $2,000 for the purpose of setting up bank accounts for use in the Scheme.

## DEFENDANTS TARGET PLAINTIFF'S OPERATIONS

45.     Plaintiff, as escrow agent, entered into a Construction Escrow Agreement, dated December 21, 2021, with non-party CP Logistics Marshall Building, 11, LLC, ("CP Logistics"), as seller of certain property, and non-party LPC Real Estate Corp. ("LPC"), as buyer of said property.

46.     Pursuant to the Escrow Agreement, CP Logistics deposited $2,258,278.00 (the "Escrow Funds") into an escrow account controlled by Plaintiff.

47.     Upon completion of the real estate transaction, the Escrow Funds were to be released by Plaintiff in accordance with the terms of the Escrow Agreement.

48.     On or about December 8, 2022, Plaintiff received an e-mail from CP Logistics' counsel requesting the release of the Escrow Funds.

49.     On December 12, 2022, Plaintiff received another e-mail, allegedly from the office of CP Logistics' counsel, providing wiring instructions for the release of the Escrow Funds (the "Fraudulent Wire Instructions").  (A true and correct copy of the Fraudulent Wire Instructions is attached to this Complaint as Exhibit "A").

50.	In fact, the e-mail was not from CP Logistics' counsel, but was from an unknown John Doe impersonating CP Logistics' counsel. The APM Actors compromised the email accounts and/or electronic systems of one or more parties to the transaction or their attorneys, resulting in "spoofed" email transmissions.

51.	The Fraudulent Wire Instructions directed that the Escrow Funds be wired into an account titled in the name of APM maintained at BOA, account number ending 5416 (the "Fraudulent Account").

52.	In reliance upon the Fraudulent Wire Instructions, on December 12, 2022, Plaintiff wired the sum of $2,258,274.00 to the Fraudulent Account.

53.	To delay discovery of the diversion of the Escrow Funds to the Fraudulent Account, the APM Actors used another spoofed email transmission to impersonate Plaintiff, and transmitted a fraudulent wire confirmation purporting to show the wiring of the Escrow Funds to an account of CP Logistics at JPMorgan Chase Bank, N.A..  (A true and correct copy of the fraudulent wire confirmation is attached to this Complaint as Exhibit "B")

54.	Subsequent to the transfer of the monies into the Fraudulent Account, Plaintiff was contacted by the Seller which advised that it had not received the released Escrow Funds.  Seller later reviewed the Fraudulent Wire Instructions and informed Plaintiff that the Fraudulent Wire Instructions were fraudulent and that the Fraudulent Account was not an account of Seller.  Seller's counsel also confirmed that the e-mail transmitting the Fraudulent Wire Instructions was not sent from his email account.

55.	Upon information and belief, the APM Actors knowingly, and with intent to defraud, accessed computers or electronic mailboxes without authorization in order to obtain the information necessary to carry out this fraud

56.     The compromised computers were protected computers under the CFAA in that they were used by the parties to conduct business dealings all over the United States and, therefore, used in or affecting interstate or foreign commerce or communications.

57.     The unauthorized access to these computers and the use of that access to commit fraud is a direct violation of the CFAA.

## THE FUNDS ARE LAUNDERED THROUGH NUMEROUS ACCOUNTS

58.     On December 13, 2022, Mr. Appelbaum traveled from his home in St. Louis, Missouri to Chicago, Illinois in order to transfer the Escrow Funds from the Fraudulent Account into other accounts.

59.     These accounts include a Bank of America account in Mr. Appelbaum's name ending x0973, a UMB Bank account in APM's name ending x3810, a UMB Bank account in Mr. Appelbaum's name ending x9745, a J.P. Morgan Chase Bank account in Mr. Appelbaum's name ending x9121, a Regions Bank account in Mr. and Mrs. Appelbaum's names ending x0314, as well as cryptocurrency exchange accounts with Gemini, MCB Foris, BAM Trading Services, Inc. d/b/a Binance.us, and Bitstamp.

60.     After transferring the Escrow Funds into cryptocurrency exchange accounts, the APM Actors transferred the funds into their own cryptocurrency wallets, or those of the other Defendants and/or John Does 1-99.

61.     These repeated transfers were done for the purpose of concealing the fact that the Escrow Funds were illegally obtained and to prevent the funds from being recovered by Plaintiff.

62.     The APM Actors engaged in at least 20 money transfers (which crossed a state or U.S. boundary in interstate or foreign commerce) of at least $5,000.

9

63.     Additionally, large amounts of cash (at least four transfers of $10,000) were withdrawn from the Bank of America account, which funds were then deposited into Mr. and Mrs. Appelbaum's shared bank account at Regions Bank.

64.     Mr. and Mrs. Appelbaum planned to use this money for their personal gain as a "nest egg."

65.     Indeed, Mrs. Appelbaum used the Escrow Funds to pay a mortgage on her home.

66.     Mr. and Mrs. Appelbaum also used these funds to pay off debt, make car payments, purchase vacations, and buy various personal property including clothes, jewelry, and trinkets.

67.     At present, the vast majority of the Escrow Funds stolen and squandered by APM and Mr. and Mrs. Appelbaum have dissipated.

## FURTHERANCE OF THE SCHEME

68.     Following the transfer in which Plaintiff was defrauded, the JMD Actors and Ms. Burnett acted in furtherance of the Scheme, by, *inter alia*, transferring money to APM to pay for the APM Actors' legal fees in defending the instant action.

69.     For example, JMD wired $10,000 to APM's account ending in -0993 at Commerce Bank on January 17, 2023. Two days later, James Dyett sent $25,000 to APM's account at Commerce Bank.  On January 23, 2023, the APM Actors wired $35,000 from the account to their counsel, Dowd Bennett.

70.     JMD also wired $10,000 more to APM's account at Commerce Bank on February 2, 2023. Riezman Berger, the APM Actors' prior lawyer, was paid from that same Commerce Bank account the next day, and then again roughly two weeks later.

71.     APM's Commerce Bank account has no legitimate sources of funding.

72.    Other unknown conspirators paid and continue to pay Mr. Appelbaum for his participation in the Scheme, including by funding a $6,000.00 escrow payment that Mr. Appelbaum made to Dowd Bennett, pursuant to an order of this Court, in order to take two family vacations.

73.    One co-conspirator explained, "[Richard's] got a legal battle going. . . with some big firm because of me . . . They are amongst the biggest three in the country . . . I have paid $62k and counting. . . In two months on his legal fees . . . hired him the best criminal representation in St. Louis."

74.    Other unknown conspirators paid and continue to pay Mrs. Appelbaum for her participation in the Scheme, including by paying for her medical bills.  One co-conspirator explained, "Sarah was brought in too so she's my responsibility."

75.    Indeed, even after this lawsuit was filed, Mr. Appelbaum helped Mrs. Appelbaum form MMB and MJP in January 2023 and fund their business bank accounts to further the Scheme.

76.    Mrs. Appelbaum then utilized those bank accounts to fund routine purchases to make it appear that the accounts were legitimate.

### THE FRAUDULENT SCHEME CONTINUES

77.    Defendants' Scheme has targeted many other victims.

78.    According to conversations between Mr. Appelbaum and his co-conspirators, the "organization has existed for years [and] knows what they are doing,"

79.    In one instance, the APM Actors defrauded Corporate Victim out of over $300,000 using the same or similar Scheme used to target Plaintiff.

80.    APM Actors provided fraudulent wiring instructions to Corporate Victim on two occasions, once on November 28, 2022 in the amount of $121,495 and once on February 13, 2023

in the amount of $202,485.  While Corporate Victim believed it was wiring funds to purchase printing equipment, the APM Actors instead caused Corporate Victim to wire funds to a bank account held by APM at Commerce Bank with an account number ending in -0993.

81.    With respect to the February 13 payment by Corporate Victim, bank records show that the next day, on February 14, 2023, Mr. Appelbaum transferred $195,000 of those funds to an APM account ending in -29401 held at CNB St. Louis Bank.  The next day, on February 15, 2023, Mr. Appelbaum transferred $190,000 of those funds to his personal account ending in -88109 at CNB St. Louis Bank.

82.    That same day, Mr. Appelbaum attempted to transfer $188,000 to Prime Trust, a cryptocurrency custodian, but that transaction failed.

83.    Several days later, on February 23, 2023, Mr. Appelbaum successfully transferred the funds to cryptocurrency exchanges, including one transfer of $85,000 to Bittrex Inc. and one transfer of $100,000 to Coinbase Inc.

84.    In another fraudulent scheme, the AMP Actors defrauded Individual Victim out of at least $10,000 using a "romance scam."[2]

---

[2] The FBI describes this scam as follows:

> Romance scams occur when a criminal adopts a fake online identity to gain a victim's affection and trust. The scammer then uses the illusion of a romantic or close relationship to manipulate and/or steal from the victim.

> The criminals who carry out romance scams are experts at what they do and will seem genuine, caring, and believable. Con artists are present on most dating and social media sites.

> The scammer's intention is to establish a relationship as quickly as possible, endear himself to the victim, and gain trust. Scammers may propose marriage and make plans to meet in person, but that will never happen. Eventually, they will ask for money.

> Scam artists often say they are in the building and construction industry and are engaged in projects outside the U.S. That makes it easier to avoid meeting in person—and more plausible when they ask for money for a medical emergency or unexpected legal fee.

*See*     https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/romance-scams, last accessed August 7, 2023.

85.    Individual Victim, an elderly individual, was coerced to wire $10,000 to APM, with a conspirator pretending to be Individual Victim's love interest named "Terry Howard."  "Terry Howard" contacted Individual Victim claiming that he was in Europe, had been beat up, and needed a $10,000 wire to avoid further violence.

86.    On September 28, 2022, Individual Victim wired $10,000 to the Fraudulent Account, held at BOA in the name of APM.

87.    Defendants' organization, including Mr. Appelbaum specifically, continue to recruit new participants to carry out the Scheme.

88.    Mr. Graham is a participant who was recruited by Mr. Appelbaum and joined the Scheme in or about January 2023.

89.    Mr. Appelbaum assisted Mr. Graham in registering a Missouri limited liability company using Mr. Graham's initials, MGA.

90.    Mr. Appelbaum then directed and taught Mr. Graham to open bank accounts in his own name and in the name of MGA at various financial institutions, as well as opening accounts at various crypto currency exchanges.

91.    Mr. Appelbaum transferred funds to Mr. Graham to fund initial deposits into Mr. Graham's and MGA's bank accounts, so that Mr. Graham could establish a pattern of use of the accounts.

92.    Funds fraudulently obtained by the APM Actors were then transferred into Mr. Graham's individual and MGA bank accounts and Mr. Graham transferred those funds into crypto-currency accounts, all under the watchful eye and direction of Mr. Appelbaum.

93.    Ms. Lanvermeier also participated in the Scheme by sending Mr. Appelbaum payments ranging from $200 to $2,000 both prior to and after December 12, 2022.

94.    The Scheme is an ongoing criminal enterprise that continues to defraud innocent victims throughout the country.

## FIRST CLAIM FOR RELIEF
### Violation of the CFAA against APM Actors and JMD Actors

95.    Plaintiff incorporates by reference all the other allegations contained in this Complaint.

96.    The knowing and intentional conduct engaged in by the APM Actors and the JMD Actors constitutes a direct violation of the CFAA.  *See* 18 U.S.C. § 1030(a), (b), (c)(4)(A)(i)(I).

97.    Prior to December 12, 2022, these defendants knowingly agreed to accomplish the unlawful acts described herein to further their scheme to steal from Plaintiff, in violation of the CFAA. *See* 18 U.S.C. § 1030(b).

98.    The CFAA specifically provides that any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator and may obtain compensatory damages and injunctive or other equitable relief.  *See* 18 U.S.C. § 1030(g).

## SECOND CLAIM FOR RELIEF
### Violation of RICO against all Defendants

99.    Plaintiff incorporates by reference all the other allegations contained in this Complaint.

100.    All Defendants associated with an enterprise, the activities of which affect interstate or foreign commerce, consisting of the APM Actors, JMD Actors, Alan Michael Graham and MGA, MMB and MJP, and Christina Lanvermeier, as well as John Does 1-99.

101.    This enterprise—the quintessential example of 21st Century organized crime—is well-organized and utilizes legitimate institutions (banks, as well as State and Federal agencies) to further its illegitimate goals.

102.    The enterprise uses cryptocurrency transactions to launder and shelter stolen funds.

103.    All Defendants directly and indirectly participated in the conduct of the above-described enterprises' affairs through a pattern of racketeering activity, to wit:

104.    At least one violation of 18 U.S.C. § 1343 (wire fraud) occurred when Defendants, having devised a scheme or artifice to defraud or to obtain money by means of false or fraudulent pretenses as described herein, transmitted or caused to be transmitted by means of wire communication in interstate or foreign commerce, a writing, sign, or signal, namely, the Fraudulent Wire Instructions, for the purpose of executing a scheme or artifice.

105.    Numerous violations of 18 U.S.C. § 1344 (bank fraud) occurred when Defendants executed a scheme or artifice to obtain monies, funds, or assets under the custody or control of banks listed above by means of false or fraudulent pretenses or representations, namely, the representations to the banks upon depositing and withdrawing funds that the funds were rightfully owned by the account holders.

106.    Numerous violations of 18 U.S.C. § 1956 (money laundering) occurred when Defendants, knowing that the property involved in the numerous financial transactions described herein represented the proceeds of unlawful activity, namely wire and bank fraud, conducted or attempted to conduct such financial transactions to conceal or disguise the nature, location,  source, ownership, or control of the proceeds of the unlawful activity.

107.    Numerous violations of 18 U.S.C. § 2314 (transportation of stolen monies) occurred when Defendants transmitted or transferred stolen money known to be stolen valued at $5,000 or more in interstate or foreign commerce, as described above.

108.    Numerous violations of 18 U.S.C. § 2315 (sale or receipt of stolen monies) occurred when Defendants received, possessed, concealed, stored, bartered, sold, or disposed of money

15

valued at $5,000 or more, which crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken, as described above.

109.   As a proximate result of these RICO violations, Plaintiff suffered and continues to suffer the loss of over $1.7 million, excluding attorneys' fees and costs.[3]

110.   Plaintiff seeks treble damages.

**THIRD CLAIM FOR RELIEF**
**Fraud against APM Actors**

111.   Plaintiff incorporates by reference all the other allegations contained in this Complaint.

112.   The APM Actors made false representations to Plaintiff by sending Fraudulent Wire Instructions and False Contact Information.

113.   Specifically, the APM Actors worked together to design and create the Fraudulent Wire Instructions, attached hereto as Exhibit A.

114.   The Fraudulent Wire Instructions were false. In sending the Fraudulent Wire Instructions, the APM Actors represented that Plaintiff could transfer the funds from the Escrow Account into the Fraudulent Account in fulfillment of Plaintiff's obligations under the Escrow Agreement. Further, by providing the False Contact Information, the APM Actors perpetuated the falsehood that the wiring information was legitimate.  The dates and  content of the false statements, and the individuals who made the false statements, are described with particularity above.

---

[3] Of the fraudulently transferred funds, $514.929.87 were frozen by Bank of America, N.A. pursuant to this Court's Temporary Restraining Order entered on January 3, 2023 (Doc. No. 14). and returned to Plaintiff by agreement of the parties.  Therefore, the amount of fraudulently transferred funds that have not been returned to Plaintiff is $1,743,344.13.

115.    Upon information and belief, each false statement made in connection with the Fraudulent Wire Instructions and False Contact Information was knowingly made and was designed to defraud Plaintiff.

116.    Plaintiff was in fact deceived by the APM Actors' false statements and actions.

117.    Plaintiff reasonably relied upon the APM Actors' false statements and actions to its detriment as described with particularity above.

118.    The misrepresentations made by the APM Actors were material in that Plaintiff would not have wired the funds to the Fraudulent Account but for the Fraudulent Wire Instructions and False Contact Information.

119.    The APM Actors' false statements and actions have directly and proximately damaged Plaintiff in an amount to be determined at trial, but that is not less than $1,743,344.13.

120.    Because of the willful or wanton conduct of the APM Actors as described above, the APM Actors are liable to Plaintiff for both compensatory and punitive damages.

**FOURTH CLAIM FOR RELIEF**
**Conversion against APM Actors**

121.    Plaintiff incorporates by reference all the other allegations contained in this Complaint.

122.    Plaintiff previously had in its possession the funds which it held in an escrow agreement.

123.    APM Actors knowingly converted to its possession the Escrow Funds by the fraud and subsequent uses described herein.

124.    Plaintiff has demanded repayment and been refused.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment against APM Actors**

17

125. Plaintiff incorporates by reference all the other allegations contained in this Complaint.

126. Plaintiff conferred a benefit on the APM Actors when it wired the Escrow Funds to the Fraudulent Account.

127. The APM actors accepted and received the funds.

128. The APM Actors retained the funds and have not repaid them to Plaintiff

129. It would be unjust and inequitable for the APM Actors to retain the funds without repayment in light of the fraud described herein.

130. Plaintiff has demanded repayment and been refused.

## SIXTH CLAIM FOR RELIEF
### Money Had and Received (Assumpsit) against APM Actors

131. Plaintiff incorporates by reference all the other allegations contained in this Complaint.

132. Plaintiff (albeit without knowing their true identity) paid the APM Actors $2,258,278.00, $1,743,344.13 of which was and continues to be retained by defendants.

133. It would be unjust and inequitable for the APM Actors to retain the funds because said payment was a result of the APM Actors' fraud.

## SEVENTH CLAIM FOR RELIEF
### Civil Conspiracy against APM Actor, JMD Actors, and Christina Lanvermeier

134. Plaintiff incorporates by reference all the other allegations contained in this Complaint.

135. The APM Actors agreed to accomplish the unlawful acts described herein to further their scheme to steal from Plaintiff, and Plaintiff has been damaged as a result.

136.    The APM Actors, JMD Actors, and Christina Lanvermeier agreed to accomplish the unlawful acts described herein, specifically the unlawful acts of Fraud and Conversion, to further their scheme to steal from Plaintiff, and Plaintiff has been damaged as a result.

**EIGHTH CLAIM FOR RELIEF**
**Constructive Trust and Equitable Lien against APM Actors**

137.    Plaintiff incorporates by reference all the other allegations contained in this Complaint.

138.    The APM Actors improperly and without authorization obtained the funds from the Escrow Account.

139.    The APM Actor's fraudulent conversion of the funds was wrongful, as the intent of the fraudulent actions was to deprive the rightfully entitled party of the funds from the Escrow Account and to expose Plaintiff to a risk of loss for the transfer of the proceeds to the Fraudulent Account.

140.    As a result of the wrongful conduct of the APM Actors, a constructive trust is warranted over the funds transferred into the Fraudulent Account, the funds in any other account at BOA or any other banking institution into which funds were transferred, and any assets acquired with, or traceable to these stolen funds.

141.    On information and belief, an unknown quantity of funds obtained unlawfully from Plaintiff can be traced to APM Actors' present share of the equity in any assets acquired with, or traceable to these stolen funds.

142.    On information and belief, the APM Actors, therefore, hold an unknown share of equity in the various property held in constructive trust for Plaintiff, the victim of APM Actors' fraudulent, deceptive, and unlawful conduct, and by virtue thereof Plaintiff is entitled to have an equitable lien declared in its favor in and on the various property.

19

143.     Accordingly, Plaintiff respectfully requests that the Court impose a constructive trust—and declare an equitable lien as appropriate—on the fraudulently obtained funds, as well as any and all monies or other assets which can be traced to the stolen funds; and grant Plaintiff such other relief as may be just and proper.

**NINTH CLAIM FOR RELIEF**
**Constructive Trust and Equitable Lien against Mrs. Appelbaum**

144.     Plaintiff incorporates by reference all the other allegations contained in this Complaint.

145.     On or about February 25, 2013, Mrs. Appelbaum, a/k/a Sarah Jane Marie Jansen, purchased the property known as Lot 198 of Meadowpark Plat Two, a Subdivision in St. Louis County, Missouri, according to the Plat thereof Recorded in Plat Book 158 Page(s) 60 of the St. Louis County Records.

146.     Mrs. Appelbaum a/k/a Sarah Jane Marie Jansen, is presently the record fee owner of the Property.

147.     A Deed of Trust exists on the Property for the benefit of lender Secretary of Housing and Urban Development.

148.     On information and belief, Mrs. Appelbaum made a payment or payments due under the Deed of Trust with funds obtained directly from Plaintiff by theft, conversion, or fraud as described herein.

149.     On information and belief, an unknown quantity of funds obtained unlawfully from Plaintiff can be traced to Mrs. Appelbaum's present share of the equity in the Property.

150.     On information and belief, Mrs. Appelbaum, therefore, holds an unknown share of equity in the property held in constructive trust for Plaintiff, the victim of her fraudulent, deceptive,

and unlawful conduct, and by virtue thereof Plaintiff is entitled to have an equitable lien declared in its favor in and on the Property.

151. Plaintiff seeks a determination by the Court of the amount of funds held in constructive trust and as an equitable lien on the Property and an order compelling Mrs. Appelbaum to liquidate the funds held in such constructive trust and deliver such funds to Plaintiff and that the Court declare an equitable lien on the Property for the benefit of Plaintiff in the amount of the funds held in trust.

## TENTH CLAIM FOR RELIEF
### Request for Injunction

152. Plaintiff incorporates by reference all the other allegations contained in this Complaint.

153. The APM Actors acquired the monies from the Escrow Account by fraudulent means.

154. Based on the manner in which the proceeds were diverted, it is likely that the APM Actors will dissipate the funds if not enjoined from doing so, making it difficult, if not impossible, to recover the converted funds.

155. This Court has the authority to issue an injunction to enjoin the dissipation of funds.

156. The CFAA also specifically provides for the award of injunctive relief.

157. The APM Actors must be enjoined from utilizing or transferring any funds received as a result of the fraudulent conduct, and from utilizing or transferring any other funds or assets acquired with the funds received as a result of the fraudulent conduct.

158. Plaintiff has shown a likelihood of success on the merits as to the foregoing claims for relief, based on the allegations set forth in this Complaint.

159.    Plaintiff is without an adequate remedy at law in this matter, as dissipation of the fraudulently diverted funds may render the funds practically unrecoverable.

160.    Plaintiff will suffer immediate and irreparable harm if the Court does not enter an order enjoining Defendants from dissipating assets obtained through the fraud.

161.    Based on Plaintiff's experience, monies fraudulently diverted are often then transferred overseas, making it impossible to recover the funds from the bad actors.

162.    No harm will be suffered from the issuance of an injunction to preserve the monies in the Fraudulent Account, and in any other account into which funds were transferred, and any other assets acquired with the proceeds received from the fraudulent conduct. Defendants have no legitimate claim to the funds sought to be preserved herein, and therefore cannot suffer harm from the issuance of an injunction.

163.    Greater harm will be suffered by Plaintiff if the injunctive relief is not granted.

164.    Granting the preliminary relief requested is in the public interest, as the Defendants have no right to benefit from the fraudulently diverted funds at the expense of the legitimate parties to the transaction and such conduct should properly be prohibited.

165.    Plaintiff respectfully requests that this Court issue an Order: (1) enjoining the APM Actors from engaging in any activity in connection with the funds in the Fraudulent Account  or any other account into which funds were transferred, so as to preclude the APM Actors from withdrawing any monies from those accounts until further Order of Court; (2) enjoining the APM Actors from utilizing, transferring, or in any manner disposing of any other assets which might have been acquired with the funds fraudulently obtained as set forth in this Complaint; and (3) granting such other relief as may be appropriate and necessary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

1.      Impose a constructive trust on the fraudulently obtained funds from the Escrow Account, as well as any and all monies or other assets which can be traced to the stolen funds;

2.      Enter an Order enjoining Defendants from engaging in any activity in connection with the funds in the Fraudulent Account and any other account at BOA or any other banking institution into which funds were transferred, so as to preclude the APM Actors from withdrawing any funds from those accounts until further Order of Court;

3.      Enter an Order enjoining Defendants from utilizing, transferring, or in any manner disposing of any other assets which might have been acquired with funds fraudulently obtained, as set forth in this Complaint;

4.      Determine the amount of funds held in constructive trust and as an equitable lien on the Property and issue an order compelling Mrs. Appelbaum to liquidate the funds held in such constructive trust and deliver such funds to Plaintiff and declaring an equitable lien on the Property for the benefit of Plaintiff in the amount of the funds held in trust;

5.      Award Plaintiff such compensatory damages against Defendants as are fair and reasonable;

6.      Award Plaintiff punitive damages for the Defendants' willful and malicious conduct;

7.      Award Plaintiff treble damages as allowed by RICO;

8.      Award Plaintiff its costs and reasonable attorneys' fees as allowed by law;

9.      Allow a trial by jury as to all matters so triable; and

10.     Award Plaintiff such other and further relief as the Court may deem just and proper.

Dated: August 18 , 2023

Respectfully submitted,

**FOX ROTHSCHILD, LLP**

By:   /s/ John A. Wait
         John A. Wait, admitted pro hac vice
         Fox Rothschild LLP
         101 Park Avenue, 17th Floor
         New York, NY 10018
         Tel: (212) 878-7900
         Fax: (212) 692-0940
         jwait@foxrothschild.com

**LEWIS RICE LLC**

By:   /s/ Jacqueline K. Graves
         John B. Greenberg, #MO40242
         Jacqueline K. Graves, #MO64875
         Lewis Rice LLC
         600 Washington Ave. Suite 2500
         St. Louis, Missouri, 63105
         Telephone:  314-444-7600
         Fax:  314-612-7675
         jgreenberg@lewisrice.com
         jgraves@lewisrice.com

*Counsel for Fidelity National Title Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 18th day of August 2023, a copy of the foregoing was filed electronically via the CM/ECF System. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system and is being served via electronic mail and U.S. Mail on the following:

Richard Appelbaum
11970 Tyra Ct.
Maryland Heights, Missouri 63043
RichardAppelbaum1984@gmail.com

Sarah Appelbaum
11970 Tyra Ct.
Maryland Heights, Missouri 63043
appelbaum2016@gmail.com

APM Management Service's, LLC
c/o Richard Appelbaum, Registered Agent
11970 Tyra Ct.
Maryland Heights, Missouri 63043
RichardAppelbaum1984@gmail.com

/s/ Jacqueline K. Graves_____