**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| FIDELITY NATIONAL TITLE INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 4:22-cv-01391-JAR |
| vs. | ) |
| | ) |
| APM MANAGEMENT SERVICE'S, LLC, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

**<u>ORDER AND JUDGMENT</u>**

This matter is before the Court on Plaintiff's motion for summary judgment (ECF No. 247) against the remaining defendants in this case: James Dyett ("Dyett"), Lisa Burnett ("Burnett"), JMD Consultant Services LLC ("JMD"), and LRD Consultant Services LLC ("LRD") (collectively, "Defendants").[1]  On February 20, 2026, Dyett, through counsel, filed a Confession of Liability on behalf of himself, JMD, and LRD conceding that they are liable for violations of the Computer Fraud and Abuse ACT ("CFAA") (Count I); the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count II); and civil conspiracy (Count VII).  (ECF No. 260).  Lisa Burnett has not opposed summary judgment as to these claims as well as the claims levied against her and the other APM actors, i.e., fraud (Count III), conversion (Count IV), unjust enrichment (Count V), and money had and received (Count VI).  Her time to oppose judgment on the claims against her has passed.  For these reasons and those explained

---

[1] The Court notes that John Does 1-99 also remain as defendants in this action.  To date, the record does not reflect that Plaintiff has ever identified these individuals, nor is there any evidence that they have been served in the time permitted by Fed. R. Civ. P. 4(m).  As such, and pursuant to Fed R. Civ. P. 4(m) and 12(b)(5), the John Doe defendants will be dismissed without prejudice.

below, the Court will grant Plaintiff's motion for summary judgment on Counts I through VII as to the remaining Defendants and will enter a judgment awarding appropriate relief.

## BACKGROUND

The following facts are adopted from Plaintiff's Statement of Undisputed Material Facts (ECF No. 249).  Because Defendants have not opposed any of the facts contained therein, they are deemed admitted.  *See* E.D.Mo. L.R. 4.01(E).

The Defendants formed and knowingly participated in a criminal enterprise (the "Enterprise") designed to lure dozens of unsuspecting businesses and individuals into wiring large sums of money to sham entities formed by members of the Enterprise.  This Enterprise was comprised of Defendants as well as other co-conspiring parties against which a judgment has already been entered in this case (ECF No. 232).  As part of the Enterprise's scheme, Defendants formed sham businesses (such as JMD and LRD), set them up with Employer Identification Numbers ("EIN") from the Internal Revenue Service to appear legitimate, opened bank accounts to receive and launder the proceeds of the scams they perpetrated, and then committed a series of crimes such as wire fraud and bank fraud in their scams against unsuspecting victims such as Plaintiff.  The Enterprise then laundered the proceeds of their criminal activity by passing the money through multiple accounts and transactions, some of which involved converting the funds to cryptocurrency, to obscure the location and source of the funds.  Relevant here, one of the ongoing, nationwide scams Defendants perpetrated was a Business Email Compromise ("BEC") scam.

Plaintiff is a title insurance company that fell victim to a BEC scam engineered by the Enterprise in 2022.  Plaintiff was acting as an escrow agent pursuant to the terms of a December 21, 2021 escrow agreement that arose from the sale of certain real property by CP Logistics

2

Marshall Building 11, LLC ("Seller") to LPC Real Estate Corp ("Buyer").  Per the escrow agreement, Seller was to deposit $2,258,278 into an escrow account controlled by Plaintiff to cover construction costs associated with certain remaining improvements to the subject property. Upon completion, Plaintiff would release the escrow funds in accordance with the escrow agreement.  Defendants knowingly and intentionally compromised, or conspired to compromise, email accounts or electronic systems of the participants in the escrow agreement in order to induce the release of the escrow funds to the Enterprise.  On December 8, 2022, Plaintiff received a legitimate email from Seller's counsel requesting the release of the escrow funds. Four days later, on December 12, 2022, the Enterprise intervened.  Plaintiff received a "spoofed" email impersonating Seller's counsel providing wire instructions for the receipt of the escrow funds.  The email was in fact orchestrated by the Enterprise and directed Plaintiff to deposit the escrow funds into an account titled in the name of APM Management Service's LLC ("APM"), one of the entities formed as part of the Enterprise.[2]  In reliance on the seemingly legitimate wire instructions, Plaintiff wired $2,258,274 to the account of APM on December 12, 2022.  Another fraudulent email was then sent to Seller, this time impersonating Plaintiff, which contained a fraudulent wire confirmation purporting to show that the escrow funds had been wired to Seller's account to delay discovery of the theft of the escrow funds.  The escrow funds were then laundered through numerus bank accounts transactions including cryptocurrency exchanges.  On December 30, 2022, Plaintiff filed this action along with a request for a temporary restraining order to attempt to recover the stolen escrow funds.

---

[2] While the exact identity of the individual who sent the impersonating emails involved here is not known, Defendants do not dispute that they knowingly and intentionally compromised or conspired to compromise electronic systems of a party to the escrow agreement in order to send this "spoofed" email.

Plaintiffs suffered significant damages as a result of Defendants' actions through the Enterprise.  During the course of this action, Plaintiff secured the return of part of the stolen escrow funds in the amount of $514,929.87.  However, to date, the remaining $1,743,344.13 has not been returned to Plaintiff.  Plaintiff has also expended a total of $588,239.90 in attorneys' fees and has incurred costs totaling $67,339.23 in its pursuit of the claims against Defendants in this action.

During the course of this action, criminal proceedings against members of the Enterprise took place as well.  Burnett, Dyett, and their co-conspirator Richard Appelbaum each entered into guilty plea agreements in which they admitted to participating in the Enterprise, which involved committing fraudulent BEC scams and subsequent money laundering.  Their guilty plea agreements make clear that Defendants participated in a criminal enterprise that victimized Plaintiff and others that involved conducting and attempting to conduct financial transactions affecting interstate and foreign commerce that involved the proceeds of wire fraud.  They admitted to participating in this fraud and money laundering scheme occurring between February 2022 and December 2023.  Burnett admitted to a series of acts in furtherance of the Enterprise's criminal activities including converting stolen funds to cryptocurrency to conceal the location and source of the funds, forming businesses for herself and others and setting up various bank accounts to demonstrate apparent legitimacy and process the large wire transfers, and recruiting others to join the Enterprise.  Dyett also admitted to converting stolen money into cryptocurrency to conceal it and forming businesses and setting up bank accounts to facilitate the wire transfers.  Dyett also specifically admitted that the fraudulent wire transfer at issue in this case was a part of the Enterprise's scheme.  Further, Appelbaum, as part of his guilty plea agreement, admitted to additional details of the scam involving Plaintiff going as far as explaining that he communicated

4

with Plaintiff's counsel after the fact to conceal the scam by representing that the escrow funds Plaintiff transferred to the APM account were owed to Appelbaum pursuant to a written agreement whereby he provided real estate consulting services.  He also provided false testimony to this effect when deposed.

All told, members of the Enterprise facilitated at least 34 wire transfers over the course of the Enterprise's nearly two years of operations, which totaled $8,344,287.57, including the stolen escrow funds at issue here.  Ultimately, Burnett, Dyett, and Appelbaum were all adjudged guilty of conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1),(h), and they were all ordered to pay restitution to Plaintiff.  To ensure complete recovery of all damages caused by Defendants' unlawful acts, Plaintiff seeks entry of a proposed civil judgment (ECF No. 262) awarding the unrecovered escrow finds, attorneys' fees, costs, and post-judgment interest.  The Court finds that Plaintiff is entitled to each.[3]

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The burden of demonstrating there are no genuine issues of material fact rests on the moving party, and the Court reviews the evidence and the inferences which reasonably may be drawn from the evidence in the light most favorable to the nonmoving party.  *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015) (citation omitted).  Here, none of the facts set forth by Plaintiff is disputed, and the Court finds that Plaintiff has set forth enough facts to show that Defendants

---

[3] Though Plaintiff also discussed the award of pre-judgment interest and punitive damages in brief in support of its motion for summary judgment, the requested award in its proposed judgment (ECF No. 262) does not include these categories of damages.

are liable for the claims asserted and that Plaintiff is entitled to recover the award of damages set forth in the proposed judgment (ECF No. 262).

As an initial matter, the Court has adopted admissions contained in Dyett's and Burnett's guilty plea agreements, which Plaintiff relied upon in its statement of facts.  *See* ECF No. 249 (quoting 4:24-cr-0366-JAR, ECF Nos. 68, 117).  "A guilty plea may be used in a subsequent civil action as evidence of the crimes committed."  *United States v. Gonzales*, 179 F. Supp. 3d 917, 926 (E.D. Mo. 2016) (quoting *Reed v. City of St. Charles*, 2007 U.S. Dist. LEXIS 41314, at *5, n.7 (E.D. Mo. June 6, 2007), *aff'd*, 561 F.3d 788 (8th Cir. 2009)).  Admissions contained in guilty plea agreements are admissible and may therefore be considered on summary judgment. *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) (admissions in guilty plea agreement of Ponzi scheme principal were found admissible and properly subject to judicial notice in civil action).

### A.  Civil Conspiracy (Count VII)

Plaintiff has demonstrated that Defendants participated in a civil conspiracy to perpetrate, among other acts, wire fraud and money laundering.  "A 'civil conspiracy' is an agreement or understanding between persons to do an unlawful act, or to use unlawful means to do a lawful act."  *Raney v. Citimorgage, Inc.*, No. 4:25-cv-0032-MTS, 2025 U.S. Dist. LEXIS 197532, at *9 (E.D. Mo. Sept. 30, 2025) (internal citations omitted).  "A claim of conspiracy must establish: (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and, (5) the plaintiff was thereby damaged."  *Id.* (internal citations omitted).  The undisputed facts show that Dyett and Burnett agreed with other members of the Enterprise to participate in a series of BEC wire fraud scams and subsequent money laundering, which the Enterprise then carried out on dozens of occasions.

6

It is undisputed that JMD and LRD were formed as vehicles of this conspiracy.  Plaintiff was among the victims of one such scam carried out in furtherance of the Enterprise's objectives and suffered the loss of the escrow funds as a result of a BEC scam.  Thus, the elements of civil conspiracy have been established.

Because Plaintiffs have successfully established the existence of a civil conspiracy between Defendants, delineating the actions of each specific actor is unnecessary to assign liability to all Defendants.  "[U]nder the civil conspiracy theory, the conspiracy gives rise to a mutual agency of each conspirator to act for the others, which makes all conspirators liable for the tortious act of any one of them."  *Bader Farms, Inc. v. Monsanto Co.*, 100 F.4th 944, 948 (8th Cir. 2024) (quoting Restatement (Second) of Torts, Sec. 876(a), cmt. a.) (internal citations omitted).  "[A] co-conspirator need not personally perform the unlawful acts which further the conspiracy's objectives" to be held liable.  *Brock v. McClure*, 404 S.W.3d 416, 421 (Mo. Ct. App. 2013).  Rather, so long as there was a meeting of the minds to engage in the unlawful act, co-conspirators "may be held jointly and severally liable for the tortious acts of [their co-conspirator], if [they] participated with him in the scheme."  *Id*.

Thus, it is inapposite whether Defendants personally participated in every act perpetuating the scam involving Plaintiff because Plaintiff has established that the scam was part of a series of the overall scheme undertaken by members of the Enterprise in furtherance of their conspiracy.  While Appelbaum and APM seem to be the primary orchestrators of the scam involving Plaintiff, Defendants are all liable.

## B.  RICO (Count II)

RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C.A. § 1962(c).  "The major purpose behind RICO is to curb the infiltration of legitimate business organizations by racketeers." *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 990 (8th Cir. 1989) (citing *United States v. Turkette*, 452 U.S. 576, 591 (1981)).  RICO provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).  To establish a violation of RICO, Plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *H & Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (quoting *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009)).  Racketeering activity is defined to include a variety of state and federal criminal offenses including wire fraud and money laundering.  18 U.S.C.A. § 1961(1).  A pattern of racketeering activity requires at least two predicate acts of racketeering that demonstrate or pose a threat of continued criminal activity.  *See Paragon Partners, Inc. v. EFS Companies, LLC*, Case No. 4:20-cv-1069-HEA, 2022 U.S. Dist. LEXIS 174313, at *44-45 (E.D. Mo. Sept. 27, 2022) (internal citations omitted).  "Continuity can be shown by related acts continuing over a period of time lasting at least one year (closed ended continuity), or by acts which by their very nature threaten repetition (open ended continuity)." *United States v. Hively*, 437 F.3d 752, 761 (8th Cir. 2006) (internal citations omitted).

The Court finds that Plaintiff has adequately proven that Defendants violated RICO.  It is clear from the undisputed facts that Defendants engaged in a pattern of predicate criminal acts, including wire fraud and money laundering, in furtherance of BEC scams that targeted individuals and entities such as Plaintiff.  Defendants participated in the formation of sham businesses, the opening of bank accounts to receive the proceeds of the scams, and a conspiracy

to commit money laundering to move and conceal the ill-gotten revenue from the Enterprise's scams.  Defendants admitted that they engaged in this conduct over a period of almost two years that resulted in 34 wire transactions, totaling over $8 million and victimizing no less than 36 individuals and entities across the United States and outside of the United States.  Further, Dyett admitted that business such as JMD and LRD were formed solely for use as part of the Enterprise.  Regardless of whether Defendants each participated in every part of the specific scam that targeted the escrow funds at issue here, it is clear that Defendants were participating members in the criminal Enterprise that defrauded Plaintiff.  The racketeering actions of Defendants and their co-conspirators caused Plaintiff to sustain damages, i.e. the loss of the escrow funds, $1,743,344.13 of which remains outstanding.  Thus, Plaintiff is entitled to relief against Defendants under RICO.

## C.  CFAA (Count I)

Plaintiff contends that Defendants are liable for violations of the CFAA.  Section 1030(a) of the CFAA provides that it is a violation of the statute to knowingly, and with intent to defraud, access a protected computer without authorization and obtain anything of value by means of such fraudulent conduct.  18 U.S.C. § 1030(a)(4).  It is also a violation to cause damage and loss by means of intentionally accessing a protected computer without authorization.  18 U.S.C. § 1030(a)(5)(C).  The term "computer" includes high speed processing devices and data storage or communications facilities related to or operating in conjunction with such processing devices, and a "protected computer" includes one that is used in or affects interstate or foreign commerce.  18 U.S.C. §§ 1030(e)(1), (e)(2)(B).  It is also a violation of the CFAA to conspire to or attempt to commit conduct that violates the statute.  18 U.S.C. § 1030(b).  The CFAA provides that a corporation that suffers damage or loss of at least $5,000 by reason of a violation of the CFAA

9

may maintain a civil action against the violator to recover economic damages.  18 U.S.C. § 1030(g).

The Court finds that the undisputed facts necessarily establish that the Enterprise gained unauthorized access to the email accounts and/or electronic communications systems of Plaintiff, Seller, and/or Buyer.  Such action is necessarily implicit in the Enterprise's apparent interception of Seller's email to Plaintiff regarding the transfer of the escrow funds.  After becoming aware of the December 8, 2022 communication of Seller's counsel to Plaintiff, the Enterprise then caused a fake email impersonating Seller's counsel to be sent to Plaintiff with wire instructions to deposit the escrow funds with APM, one of the sham businesses formed to receive the proceeds of the BEC scam.  The Court finds that this is enough to establish that Defendants violated, and/or conspired to commit violations of, the CFAA.

## D.  Fraud (Count III)

Plaintiff contends that Defendants are liable for fraud as a result of the civil conspiracy. To recover damages for fraud, a plaintiff must prove the following elements:

> 1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of its falsity, or his ignorance of its truth; 5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; 6) the hearer's ignorance of the falsity of the representation; 7) the hearer's reliance on the representation being true; 8) his right to rely thereon; and, 9) the hearer's consequent and proximately caused injury.

*Boland v. St. Luke's Health Sys.*, 588 S.W.3d 879, 883 n. 7 (Mo. 2019).

The facts establishing fraud are undisputed and clear.  Defendants began by establishing sham businesses and opening bank accounts with the purpose of appearing legitimate and receiving stolen funds.  Following a communication from Seller to Plaintiff directing Plaintiff's release of the escrow funds, the Enterprise intervened and caused Plaintiff to receive an email impersonating Seller's counsel that directed Plaintiff to initiate a wire transfer of the escrow

10

funds to an account that was in fact held by a sham business involved in the Enterprise formed for the purpose of receiving stolen funds. Believing that this email was from Seller's counsel, which it was not, Plaintiff relied to its detriment on the new wire instructions in releasing over $2 million in escrow funds to the account of APM. In order to conceal and delay discovery of the theft of the escrow funds, another fake email, this time impersonating Plaintiff, was sent to Seller by the Enterprise with a fake wire confirmation purporting to show the wiring of the escrow funds to Seller's account. Dyett and Appelbaum both specifically admitted that this scam was part of the Enterprise's fraudulent scheme to victimize Plaintiff and others. Burnett's guilty plea agreement makes clear that she participated in the Enterprise with the intent and purpose of carrying out its fraudulent activities. Appelbaum's guilty plea agreement also reveals that after this scam was carried out and the funds were fraudulently secured, he made further representations to Plaintiff's counsel that APM was owed the funds it received as a result of Appelbaum's provision of certain real estate consulting services and testified as much during his deposition. It is clear that the BEC scam that was perpetrated against Plaintiff constituted fraud, and Defendants are each jointly and severally liable by nature of the civil conspiracy in which they participated to carry out this scheme, and other similar ones, against Plaintiff and other unsuspecting victims.

### E. Conversion (Count IV)

Plaintiff contends that Defendants are also liable for conversion through their participation in the civil conspiracy. The elements of conversion under Missouri law are: "(1) plaintiff was the owner of the property or entitled to its possession; (2) defendant took possession of the property with the intent to exercise some control over it; and (3) defendant thereby deprived plaintiff of the right to possession." *Mo. Ozarks Radio v. Baugh*, 598 S.W.3d 154, 160-

61 (Mo. Ct. App. 2020). When conversion is successfully proven, a plaintiff is entitled to recover the value of the property at the time of conversion. *Id.* at 161 n. 3.

Here, it is undisputed that Plaintiff was in lawful possession of escrow funds pursuant to an escrow agreement with Seller and Buyer. APM took possession of the escrow funds through the fraudulent acts of the Enterprise, who then laundered the proceeds through a series of transactions to conceal the funds. Though a portion of the escrow funds were later recovered, Plaintiff continues to be deprived of its lawful possession of $1,743,344.13. Defendants are jointly and severally liable for conversion of the escrow funds by nature of the civil conspiracy designed to perpetuate scams such as the one against Plaintiff.

### F. Money Had and Received (Assumpsit) (Count VI) and Unjust Enrichment (Count V)

Plaintiff contends that Burnett is liable for unjust enrichment and money had and received. "Unjust enrichment and money had and received claims are very similar claims founded upon equitable principles that sound in quasi-contract." *Bonin v. Gould*, 713 S.W.3d 281, 287 n. 4 (Mo. Ct. App. 2025). To establish money had and received under Missouri law, Plaintiff must prove three elements: "(1) the defendant received or obtained possession of the plaintiff's money; (2) the defendant thereby appreciated a benefit; and (3) the defendant's acceptance and retention of the money was unjust." *Gerke v. City of Kan. City*, 493 S.W.3d 433, 438 (Mo. Ct. App. 2013) (internal quotations omitted). An action under this theory "lies for restitution of money that belongs in good conscience to the plaintiff, but was obtained by the defendant by duress or other means making it unjust for the defendant to keep the money." *Karpierz v. Easley*, 68 S.W.3d 565, 570 (Mo. Ct. App. 2002) (internal quotations omitted). Similarly, a defendant has been unjustly enriched if the plaintiff establishes: "(1) the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the

12

plaintiff; and (3) that it would be unjust to allow the defendant to retain the benefit." *Cent. Parking Sys. of Mo., LLC v. Tucker Parking Holdings, LLC*, 519 S.W.3d 485, 498 (Mo. Ct. App. 2017) (internal quotations omitted).  The measure of damages to which a plaintiff is entitled in an action arising under these two claims is "the amount of the benefit conferred upon the defendant" that would be unjust for the defendant to retain.  *Pitman v. City of Columbia*, 309 S.W.3d 395, 403 (Mo. Ct. App. 2010).

Here, it is clear that Burnett is liable for these claims by her actions participating in the conspiracy with Defendants and others.  By nature of her participation in the Enterprise, Burnett and the "APM actors"[4] received the escrow funds from Plaintiff through fraudulent representations to Plaintiff, and it would be unjust to allow the Enterprise to retain the proceeds of this scam.  As such, Plaintiff has established entitlement to damages by way of unjust enrichment and money had and received.

### G. Damages

As an initial matter, Plaintiff's motion for summary judgment makes clear that Plaintiff does not seek duplicate recovery under each theory of liability but rather presents each cause of action "for the Court's convenience in fashioning the judgment to the fullest extent allowable to Plaintiff." (ECF No. 248 at 25 n. 1).  And indeed, Plaintiff has already been made the beneficiary of restitution in the criminal proceedings involving Burnett, Dyett, and Appelbaum and has already obtained default judgments for treble damages, attorneys' fees, costs, and post-judgment interest against Defendants Richard and Sarah Jane Appelbaum; APM; Alan Michael Graham; Christina Lanvermeier; MGA Global Enterprises LLC; mmb management services, llc;

---

[4] The APM Actors are defined in the Second Amended Complaint to include APM, Burnett, Richard Appelbaum, Sarah Jane Appelbaum, and their agents, representatives, and associates. (ECF No. 165 at p. 2).

and MJP Enterprises, LLC (*see* ECF No. 232).  However, in finding that Burnett, Dyett, JMD, and LRD are also liable, the Court finds that Plaintiff is entitled to an award of damages against each under the theories described above.  The Court notes that this recovery encompasses, and is not in addition to, the restitution to which Plaintiff is already entitled by way of the criminal judgments against Defendants.

Plaintiff's economic losses as a result of the claims described above are clear.  It is undisputed that Defendants stole $2,258,274,000 in escrow funds from Plaintiff, $1,743,344.13 remains unrecovered as a result of Defendants' fraud, conversion, unjust enrichment, assumpsit, and violations of RICO and CFAA described above.  In addition to recovering $1,743,344.13 in direct compensation for the escrow funds that remain unrecovered, a business damaged by reason of a violation of RICO is entitled to recover "threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee…."  18 U.S.C. § 1964(c).  As such, Defendants are jointly and severally liable for treble damages in the amount of $5,230,032.39.

Further, Plaintiff has established sufficient grounds to justify recovery of reasonable attorneys' fees and costs.  RICO mandates the recovery of reasonable attorneys' fees.  18 U.S.C. § 1964(c).  Additionally, while attorneys' fees are generally not recoverable for tort actions under Missouri law, a plaintiff who has successfully proven fraud under Missouri law "may also recover special damages necessarily incurred solely by reason of the fraud" including "the professional aid of an attorney to mitigate damages and to avoid future losses."  *McCall v. Jim Lynch Cadillac, Inc.*, 791 S.W.2d 456, 458 (Mo. Ct. App. 1990) (citations omitted).  Plaintiff's counsel has attested, and provided supporting documentation, that Plaintiff has incurred a total of $588,239.90 in attorneys' fees in tracing the lost escrow funds, pursuing immediate injunctive relief to attempt to prevent the loss of the funds, and pursuing the return of the funds through this

14

litigation.  As the prevailing party, Plaintiff is also entitled to its costs pursuant to Fed. R. Civ. P. 54(d)(1).  Plaintiff's counsel has attested that Plaintiff has incurred $67,339.23 in costs to pursue Plaintiff's claims against Defendants.  In support, Plaintiff points to the bill of costs filed on May 13, 2025 in which Plaintiff's costs in pursuing this action are itemized.

Pursuant to 28 U.S.C. § 1961(a), Plaintiff is also entitled to post-judgment interest on the award of damages.  28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.").  Thus, the Court will award post-judgment interest on the treble damages award from the date of judgment at the current statutory rate pursuant to Section 1961(a).

**CONCLUSION**

For the reasons set forth herein,

**IT IS HEREBY ORDERED** that Plaintiff's claims against Defendants John Does 1-99 are **DISMISSED** without prejudice.

Having reviewed Plaintiff's motion for summary judgment, Plaintiff's memorandum in support (ECF No. 248), Plaintiff's statement of uncontroverted material facts (ECF No. 249), the attendant affidavits and exhibits supporting the award of damages, fees and costs requested by Plaintiff, as well as the Confession of Liability filed by Defendant James Dyett, for himself and on behalf of JMD Consultant Services LLC and LRD Consultant Services LLC (ECF No. 260), Plaintiff's motion for summary judgment on Counts I through VII as to the remaining Defendants is **GRANTED**.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that judgment is entered in favor of Plaintiff and against Defendants Lisa Burnett, James Dyett, JMD Consultant

15

Services LLC, and LRD Consultant Services LLC, all jointly and severally, in the amount of **$5,885,611.52**, which is inclusive of the following:

 • Treble damages, pursuant to 18 U.S.C.A. § 1964, totaling **$5,230,032.39** (representing three times the outstanding amount in fraudulently diverted funds);

 • Attorneys' fees totaling **$588,239.90**;

 • Costs of suit totaling **$67,339.23**; and

 • Post-judgment interest at the statutory rate pursuant to 28 U.S.C. § 1961.


Dated this 31st Day of March, 2026.


_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE

16